IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | |
| | § | |
| WADE NEAL BARKER (3), DOUGLAS | § | |
| SUNG WON (9), MICHAEL BASSEM | § | No. 3:16-cr-516-D |
| RIMLAWI (10), DAVID DAESUNG | § | |
| KIM (11), WILLIAM DANIEL | § | |
| NICHOLSON, IV (12), SHAWN MARK | § | |
| HENRY (13), and MRUGESHKUMAR | § | |
| KUMAR SHAH (14), | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER ON MOTIONS REGARDING
CONDITIONS OF PRETRIAL RELEASE**

Defendants Douglas S. Won ("Dr. Won"), Michael Bassem Rimlawi ("Dr. Rimlawi"), David Daesung Kim ("Dr. Kim"), William Daniel Nicholson, IV ("Dr. Nicholson"), and Shawn Mark Henry ("Dr. Henry") (collectively, the "Moving Defendants") have filed a Motion to Clarify and Modify Conditions of Release. *See* Dkt. No. 169 (the "Motion to Clarify"). The government has filed a response in opposition. *See* Dkt. No. 217.

And the government has filed a Motion to Modify Conditions of Supervised Release as to the five Moving Defendants as well as Defendants Wade Neal Barker ("Dr. Barker") and Mrugeshkumar Kumar Shah ("Dr. Shah"). *See* Dkt. No. 171 (the "Motion to Add Conditions"). The Moving Defendants and Dr. Shah filed a response, *see* Dkt. No. 220, as did Dr. Barker, *see* Dkt. No. 218.

-1-

United States District Judge Sidney A. Fitzwater referred both motions to the undersigned United States magistrate judge for a hearing, if necessary, and determination under 28 U.S.C. § 636(b)(1)(A). *See* Dkt. Nos. 174 & 175.

The Court set the Motion to Clarify and the Motion to Add Conditions for a hearing on January 23, 2017, *see* Dkt. No. 184, but later, after reviewing all the filings on the motions, determined that both motions can and should be resolved on the papers alone and cancelled the hearing, *see* Dkt. No. 223.

For the reasons and to the extent explained below, the Court now GRANTS the Motion to Clarify and Modify Conditions of Release [Dkt. No. 169] and DENIES the Government's Motion to Modify Conditions of Supervised Release [Dkt. No. 171].

## Background

I.   What's happened so far

In an indictment out of this district, Dr. Won, Dr. Kim, and Dr. Nicholson are each charged with Conspiracy to Pay and Receive Health Care Bribes and Kickbacks in violation of 18 U.S.C. § 371, Offering or Paying and Soliciting or Receiving Illegal Remuneration and Aiding and Abetting in violation of 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2, and offenses under the Travel Act and Aiding and Abetting (Commercial Bribery) in violation of 18 U.S.C. §§ 1952 and 2; Dr. Barker and Dr. Henry are each charged with all of those offenses and with Conspiracy to Commit Laundering of Monetary Instruments in violation of 18 U.S.C. § 1956(h); and Dr. Rimlawi and Dr. Shah are each charged with Conspiracy to Pay and Receive Health Care Bribes and Kickbacks in violation of 18 U.S.C. § 371 and Offering or Paying and Soliciting or

Receiving Illegal Remuneration and Aiding and Abetting in violation of 42 U.S.C. §

1320a-7b(b) and 18 U.S.C. § 2. *See* Dkt. No. 1.

As the government summarizes it,

> [t]he indictment here charges that the defendants received millions of
> dollars in bribes and kickbacks for steering patients with both in and
> out-of-network insurance benefits to Forest Park Medical Center (FPMC),
> so the hospital's owners and managers could unjustly enrich themselves
> through the lucrative out-of-network billing. (Indictment ¶ 49.) Because
> out-of-network services can be financially detrimental to patients as a
> result of substantial coinsurance, FPMC, in an effort to facilitate its bribe
> and kickback payments, also waived or substantially reduced patients'
> out-of-network coinsurance, yet concealed this material fact from the
> patients' plans and programs when submitting bills. (Indictment ¶¶
> 82-89.) Indeed, patients at FPMC were routinely guaranteed prior to
> surgery that their total out-of-pocket expenses would be no more than
> they would be at an in-network facility, despite the fact that FPMC
> intended to, and did, bill the patients' plans and programs at higher
> out-of-network rates and were reimbursed accordingly. (Indictment ¶ 83.)
> The defendants were complicit in this practice: they consented to FPMC's
> unwritten waiver/reduction policy and would communicate it to patients
> before steering them to FPMC. (Indictment ¶ 84.) The charges in the
> indictment are supported by a myriad of documents, emails, and witness
> statements secured during the government's investigation.

Dkt. No. 171 at 2.

The government did not move to detain Dr. Barker, Dr. Won, Dr. Rimlawi, Dr.

Kim, Dr. Nicholson, Dr. Henry, or Dr. Shah. Since the time of these defendants' initial

appearances, this case has seen more than its share of disputes and motions regarding

certain proposed or imposed special conditions of pretrial release under 18 U.S.C. §

3142(c)(1)(B).

The Order Setting Conditions of Release as to each of the Moving Defendants

and Dr. Shah included as a special condition that the defendant "avoid all contact,

directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: codefendants." Dkt. No. 32 at 2 (Dr. Won); Dkt. No. 38 at 2 (Dr. Rimlawi); Dkt. No. 43 at 2 (Dr. Kim); Dkt. No. 48 at 2 (Dr. Nicholson); Dkt. No. 53 at 2 (Dr. Henry); Dkt. No. 57 at 2 (Dr. Shah). Dr. Barker had his initial appearance in the United States District Court for the Central District of California, where the magistrate judge imposed the following, similar special conditions: "Avoid all contact, directly or indirectly (including by any electronic means), with any person who is a known victim or witness in the subject investigation or prosecution" and "Avoid all contact, directly or indirectly (including by any electronic means), with any known codefendants except in the presence of counsel." Dkt. No. 107 at 7 of 16.

At the government's urging, this Court also included in the Order Setting Conditions of Release for each of the Moving Defendants – without much, if any, objection by these defendants – a special condition precluding Dr. Won, Dr. Rimlawi, Dr. Kim, Dr. Nicholson, and Dr. Henry each from "billing federal insurance programs, including Medicare, Medicaid, Department of Labor, Tricare, and Federal Healthcare Benefits Program." Dkt. No. 32 at 3 (Dr. Won); Dkt. No. 38 at 3 (Dr. Rimlawi); Dkt. No. 43 at 3 (Dr. Kim); Dkt. No. 48 at 3 (Dr. Nicholson); Dkt. No. 53 at 3 (Dr. Henry). But, after argument by counsel, the Court did not impose this same special condition on Dr. Shah when entering its Order Setting Conditions at his initial appearance. *See* Dkt. No. 57 at 3.

And, more specifically as to Dr. Won, the original Order Setting Conditions precluded "billing for Dr. Won's own services to federal insurance programs, including

Medicare, Medicaid, Department of Labor, Tricare, and Federal Healthcare Benefits Program or direct to insurance companies on an out-of-network basis." Dkt. No. 32 at 3. The Court later granted an Agreed Motion to Modify Conditions of Release [Dkt. No. 82] and changed this special condition to provide only "[n]o billing federal insurance programs, including Medicare, Medicaid, Department of Labor, Tricare, and Federal Healthcare Benefits Program." Dkt. No. 94.

Dr. Barker's release order likewise imposed as a special condition that "Deft. not be allowed to bill any fed ins. companies incl. Medicare, Medicaid, Dept. Labor, Tricare, Federal Healthcare Benefits Programs." Dkt. No. 107 at 8 of 16. Dr. Barker has not moved to modify this condition. *See* Dkt. No. 218 at 2, 6.

In granting Dr. Kim's Unopposed Motion to Modify Conditions of Pretrial Release [Dkt. No. 148], the Court again imposed this special condition on Dr. Kim but provided that the Order Setting Conditions of Release [Dkt. No. 43] "is further modified to allow the entity David D. Kim, M.D., P.A. to bill Federal Health Care Benefits Programs for surgeries performed by other surgeons contracted with David D. Kim, M.D., P.A." Dkt. No. 166 at 2.

Dr. Barker's release order also imposed the following special condition: "Deft. prohibited from accepting payments from any hospital or surgical center or any business affiliated directly or indirectly with a hospital or surgical center." Dkt. No. 107 at 8 of 16. Dr. Barker does not challenge this condition. *See* Dkt. No. 218 at 2, 6.

This Court, at the government's urging, imposed essentially the same special condition on Dr. Won, Dr. Rimlawi, Dr. Kim, Dr. Nicholson, Dr. Henry, and Dr. Shah:

-5-

"Do not accept or facilitate payment from any hospital, or surgical center, or any business affiliated directly or indirectly with a hospital or surgical center to any individual or entity with the intent to direct patients or referrals to a hospital or surgical center." Dkt. No. 32 at 3 (Dr. Won); Dkt. No. 38 at 3 (Dr. Rimlawi); Dkt. No. 43 at 3 (Dr. Kim); Dkt. No. 48 at 3 (Dr. Nicholson); Dkt. No. 53 at 3 (Dr. Henry); Dkt. No. 57 at 3 (Dr. Shah); Dkt. No. 94 (Dr. Won).

The Court later entered an Order Granting Motion of Defendant Wade Neal Barker to Modify Conditions of Release, which provided "that the conditions of pretrial release relating to Defendant Wade Neal Barker [are] modified to permit the defendant to (1) travel to and from all federal judicial districts within the continental United States and (2) communicate directly with his co-defendant, Richard Toussaint, concerning the sale of their jointly-owned residential property in the Bahamas." Dkt. No. 146 at 1.

The Court's Order Granting Defendant David Kim's Unopposed Motion to Modify Conditions of Pretrial Release similarly modified Dr. Kim's Order Setting Conditions of Release [Dkt. No. 43] "to allow Dr. Kim to communicate with any employees or contractors who work with his medical practice regarding matters unrelated to the subject indictment." Dkt. No. 166 at 2.

The Court also entered an Agreed Order Granting Defendant Andrew Hillman's Unopposed Motion to Modify Conditions of Pretrial Release, which provided that "Defendant Andrew Hillman's Order Setting Conditions of Release [D.E. 68] is modified to allow Mr. Hillman to communicate with Defendant Semyon Narosov

-6-

regarding matters unrelated to the case." Dkt. No. 95 at 2. And the Court later entered an Agreed Order Granting Defendant Andrew Hillman and Semyon Narosov's Unopposed Motion to Modify Conditions of Pretrial Release to Permit Communications in Presence of Counsel, which provided that "Defendant Andrew Hillman's Order Setting Conditions of Release [D.E. 68] and Defendant Semyon Narosov's Order Setting Conditions of Release [D.E. 73] are modified to allow them to communicate directly with each other on matters related to this case if at least one counsel of record is present." Dkt. No. 191 at 2.

And "[t]he Court, without opposition by the government, [granted] the January 9, 2017 Joint Motion to Modify Conditions of Release [Dkt. No. 194] and [modified] the Order Setting Conditions of Release as to [Defendants Alan Andrew Beauchamp, Carli Adele Hempel, and Kelly Wade Loter] [Dkt. Nos. 12, 22, & 102] to provide that Alan Andrew Beauchamp, Carli Adele Hempel, and Kelly Wade Loter are permitted to have contact and communicate about Ascription Medical Consultants." Dkt. No. 212.

Finally, the pretrial release orders as to each of the Moving Defendants and Dr. Shah and Dr. Barker require these defendants to each maintain employment while on release. *See* Dkt. No. 32 at 2 (Dr. Won); Dkt. No. 38 at 2 (Dr. Rimlawi); Dkt. No. 43 at 2 (Dr. Kim); Dkt. No. 48 at 2 (Dr. Nicholson); Dkt. No. 53 at 2 (Dr. Henry); Dkt. No. 57 at 2 (Dr. Shah); Dkt. No. 107 at 6 of 16 (Dr. Barker).

II.     The pending motions

    A.     Defendants' Motion to Clarify and Modify Conditions of Release

    In their Motion to Clarify, the Moving Defendants explain that they "are

-7-

physicians who desire to continue practicing and treating patients during the pendency of this matter" and that "[t]he conditions of release applied to the physician defendants were not uniform, and were entered based on limited facts regarding the impact of such conditions" and that, as laid out above, "[a]s a result, several defendants have sought clarification and modification of the conditions of release, leading to further inconsistencies in the conditions of release." Dkt. No. 169 at 1-2.

"In order to efficiently address the conditions of release as to the physicians, and to apply the least restrictive conditions to reasonably assure the safety of the community while allowing Defendants to continue treating patients," the Moving Defendants ask the Court to clarify and modify their respective conditions of pretrial release to remove the special conditions providing for "[n]o billing federal insurance programs, including Medicare, Medicaid, Department of Labor, Tricare and Federal Healthcare Benefits Program" and "to allow [the Moving] Defendants to communicate with any physicians, employees, or contractors, including co-defendants, with whom they work regarding matters unrelated to the subject indictment." *Id.* at 2-5.

The Motion to Clarify notes that "the Court did not order any limitation on the ability of Dr. Shah – who is Dr. Rimlawi's colleague at the Minimally Invasive Spine Institute – to bill federal insurance programs, including Medicare, Medicaid, Department of Labor, Tricare or the Federal Healthcare Benefits Program" and then explains that,

> [w]hile Defendants treat very few Medicare and Medicaid patients
> directly and did not object to the imposition of such condition at the time
> of the hearing for that reason, the restriction precluding billing of federal

programs is causing significant interruption in Defendants' ability to treat patients on an ongoing basis.

6.    Specifically, other health care providers, including physicians, who practice at entities with which Defendants' are affiliated or have an ownership interest bill federal insurance programs. Certain Defendants have lost and continue to lose privileges at certain hospitals and facilities because the entity by-laws require treating physicians to have the ability to bill federal programs.

7.    In addition, for patients with private insurance, federal programs are often used to provide coverage as a secondary provider. In such cases, the primary insurance provider may claim reimbursement from the secondary provider, a federal program, without the physicians' involvement, consent or knowledge. Accordingly, Defendants request that the Court modify each of their conditions of release to remove such condition, just as it did for Co-Defendant Mrugeshkumar Kumar Shah (14).

*Id.* at 2-3 (emphasis removed).

The Moving Defendants report that, as to Dr. Shah, they "understand the Court was sympathetic to the fact that disallowing federal billing would essentially shut down Dr. Shah's practice, and the Court wanted Dr. Shah to remain gainfully employed during the term of his pretrial release," and that they "understand that the Government did not object to Dr. Shah continuing to accept Medicare payments." *Id.* at 3. But, the Moving Defendants argue,

[m]odifying this condition of Defendants' release is further warranted by the fact that the Medicare/Medicaid prohibition has no nexus to allegations in the Indictment. Specifically, the Indictment contains no allegation that Defendants submitted false or fraudulent billings for any of the services they personally performed. In fact, Defendants have been charged for allegedly accepting bribes or kick-backs as referrals for private pay out-of-network patients in which federal billing programs were billed as a secondary provider unbeknownst to Defendants. The Government seeks to convert such acts into criminal activity by pursuing this novel theory under the Federal Travel Act, which the Government contends encompasses payment made by private insurance companies, for precisely the reason that they did not accept any payments from

government payors.

*Id.* at 3. And, the Moving Defendants contend, "the alleged conspiratorial acts ceased in 2013," and the Moving "Defendants are unaware of any allegation that either they, or their respective physician practice groups, have allegedly engaged in any unlawful practice vis-à-vis a government payor such as Medicare or Medicaid, or that they continue to engage in any purportedly unlawful behavior." *Id.* at 3-4. "Accordingly, not only is lifting the government payor ban appropriate, to further burden Defendants with the same would violate Section 3142's mandate that whatever conditions of release are imposed on a defendant be the least restrictive conditions to reasonably assure the safety of the community," where the Moving "Defendants have agreed to follow the law and 'not accept or facilitate payment from any hospital, or surgical center, or any business affiliated directly or indirectly with a hospital or surgical center to any individual or entity with the intent to direct patients or referrals to a hospital or surgical center,'" such that "[a]ny further restriction is unnecessarily restrictive and punitive." *Id.* at 4.

As to the restriction on contact with witnesses, the Moving Defendants explain that they "seek clarification of [the no-contact-with-witnesses-or-co-defendants] condition because this restriction is currently impeding certain Defendants' ability to treat patients and is unnecessarily restrictive. For example, Dr. Rimlawi is a spine surgeon practicing at the Minimally Invasive Spine Institute. Co-defendant Shah also practices as a physician at the Minimally Invasive Spine Institute, where he specializes in pain treatment." *Id.* at 4-5. "To ensure appropriate patient care and the efficient

-10-

operation of the Minimally Invasive Spine Institute, Dr. Rimlawi and Dr. Shah need to be able to communicate. For the same reason, Dr. Rimlawi needs to be able to communicate with his other colleagues at the Minimally Invasive Spine Institute, who may be witnesses in this action." *Id.* at 5.

The Moving Defendants "request this Court clarify this communication restriction to allow Defendants to communicate with any physicians, employees, or contractors, including co-defendants, with whom they work regarding matters unrelated to the subject indictment." *Id.*

The government is opposed. It asserts that the Motion to Clarify "requests sweeping relief, including the removal of all billing restrictions and restrictions on contact with codefendants and potential witnesses. In effect, the defendants are asking this Court to refrain from imposing conditions of release that are quasi-standard in healthcare conspiracy cases because the conditions are allegedly 'causing significant interruption' in the defendants' lives and they have already 'agreed to follow the law.'" Dkt. No. 217 at 1.

The government insists that "[t]he billing restriction is narrowly tailored and well supported by the nearly $100 million in federal billing that resulted from the charged conspiracy." *Id.* The government contends that "Congress has long recognized that health care violations pose an economic danger, especially to federally-funded health care programs," and that, "[b]ecause of this danger, courts in this and other districts routinely preclude defendants under indictment for health care crimes related to federal programs from billing those programs for the pendency of their release." *Id.*

-11-

at 2, 3. The government explains that "[s]uch conditions are warranted because [p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law" and that "[t]his case is no different." *Id.* at 3 (internal quotation marks omitted).

> According to the government,

> [a]s a result of the bribes and kickbacks solicited by the coconspirators, including the above defendants, FPCM billed federally-funded health care programs, including TRICARE, FECA/DOL, and Federal Employees Health Benefits Program (FEHBP), nearly $100 million. (Dkt. ¶ 97.) Defendants Won, Kim, Rimlawi, and Nicholson are all charged with substantive counts under the Federal Anti-Kickback Statute related to FECA or TRICARE, and defendant Henry's referrals to FPMC during the conspiracy yielded over $2.5 million in billings to FECA. Further, all of the defendants illegally referred patients to FPMC that resulted in substantial billing to FEHBP. In addition, several of the conconspirators, including defendant Kim, are charged with conspiring to refer their Medicare and Medicaid patients to other facilities in exchange for cash. (Dkt. 1 ¶¶ 139-140.) For this reason, the Court imposed a condition prohibiting these defendants from "billing federal insurance programs, including Medicare, Medicaid, Department of Labor [FECA/DOL], Tricare and Federal [Employees] Healthcare Benefits Program." (See, e.g., Dkt. 38.) The defendants raised no objection to this condition at their initial appearances.

*Id.* at 3-4.

The government argues that none of the Moving Defendants' objections "alter the Court's prior conclusion that the [no-billing-federal-programs] condition is necessary to reasonably assure the economic safety of the federal fisc." *Id.* at 4. According to the government,

> [t]he defendants first contend that "certain defendants have lost and continue to lose privileges at certain hospitals and facilities because by-laws require treating physicians to have the ability to bill federal programs." (Mot. at 2.) But these vague and unsubstantiated collateral

consequences have nothing to do with the question before the Court: whether the condition is necessary to reasonably assure the economic safety of taxpayers. The charges in the indictment lead to the inescapable conclusion that they are. *See Call*, 874 F. Supp. 2d at 979.

Next, the defendants contend that federal programs are often secondary payors for their patients. But needing to violate a condition of release is not evidence that the condition is overly broad or unnecessary to reasonably ensure economic safety. If anything, the defendants' admission that they continue to treat patients with federal insurance reinforces the necessity of the challenged condition.

Notably, the defendants are not similarly situated to defendant Shah. Over the government's strenuous objection, the Court permitted defendant Shah to bill federal programs because he received the least amount of bribe/kickback money in the case and his counsel represented that Shah's inability to bill federal programs would preclude him from practicing medicine. In other words, the Court was sympathetic to the argument that it could not release a defendant under conditions which effectively rendered him unemployable.

That is not the situation with defendants Won, Rimlawi, Kim, Nicholson, and Henry. Indeed, at their initial appearances, these defendants argued just the opposite: that precluding them from billing private insurance companies on an out-of-network basis would effectively put them out of business. In fact, it was this argument that caused the Court to effectively reverse course and cease imposing the requested no out-of-network billing restriction on the defendants. In short, the defendants – by their own admission – are not similarly situated to defendant Shah. Accordingly, there is no reason that the conditions of their release should mirror his.

Finally, the defendants contend that there is no allegation that they continue to violate the law and note that they have already "agreed to follow the law." But this argument ignores that the defendants are already under indictment for violating the law, specifically with respect to federally-funded health care programs. The defendants' argument reduces to an assertion that precluding them from "violating federal, state, or local law," is sufficient restriction. But this is merely a requirement of citizenship; it does nothing to "reduce the risk that the defendant[s] will engage in similar or related criminal activities to those charged in the complaint or indictment." *See Call*, 874 F. Supp. 2d at 979. The federal-billing restriction that the Court previously imposed does. The Court imposed that condition after hearing extended argument from the parties and defendants' motion offers no compelling reason to abolish it.

*Id.* at 4-6 (emphasis removed).

And, "[a]s for contact with codefendants and witnesses, the government [contends that it] has been more than reasonable in accommodating specific requests from defendants who currently work together and therefore must communicate about non-case related matters as part of their jobs" but that the Moving Defendants "provide no support for the sweeping request they seek and, to the government's knowledge, none exists." *Id.* at 1-2.

The government asserts that "[c]ommon sense dictates that defendants should not be permitted to discuss the substance of the case with witnesses and codefendants. Such communication creates a substantial risk that witnesses' memories will become distorted and that codefendants could collude to get their stories straight." *Id.* at 6. According to the government, "[t]o mitigate this risk, courts virtually always impose a condition directing defendants to 'avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or Prosecution,'" and, "where multiple defendants are charged in the same case, the condition is virtually always extended to forbid contact with codefendants." *Id.* at 6-7.

The governments asserts that the Moving Defendants "provide no argument or justification for blanketly lifting this condition and that, "[b]eyond noting that defendants Shah and Rimlawi work together, they provide no argument or evidence in support of their requested relief whatsoever." *Id.* at 7. The government contends that it "has been and will continue to be reasonable in accommodating specific requests where this condition interferes with a particular defendant's ability to practice

medicine or otherwise conduct ongoing business" but that "the Court should reject defendants' sweeping and unsupported request to blindly lift the condition as to all." *Id.*

B.      The Government's Motion to Modify Conditions of Supervised Release

In its Motion to Add Conditions, "[t]he government moves under 18 U.S.C. § 3142(c)(3) to modify the [] conditions of pretrial release [for Dr. Barker, Dr. Won, Dr. Rimlawi, Dr. Kim, Dr. Nicholson, Dr. Henry, and Dr. Shah] to require that any out-of-network billing they cause be supported by (1) documentation that the patient's full coinsurance was collected (both for the facility fee and the professional services fee); (2) documentation of a legitimate financial hardship on the part of the patient that precluded collection of coinsurance; or (3) in the event that the physician or facility chooses to waive or reduce the patient's coinsurance, proof that this material fact was disclosed to the patient's insurance carrier before or at the time that the physician/facility billed the insurer for services." Dkt. No. 171 at 1; *see also id.* at 3. "The government requests that the defendants submit documentation of the above to the Federal Bureau of Investigation, and, with their consent, to pretrial services, for the duration of their release." *Id.* at 1.

The government explains that, in light of the charges in the indictment, "and the evidence gathered during the investigation, the government previously requested that the Court impose a condition of release restricting the defendants' ability to bill on an out-of-network basis. In the government's view, this proposed condition was well supported by the allegations in the indictment, consistent with conditions that this

district generally imposes in healthcare fraud cases, and necessary to protect the public from financial harm." *Id.* at 2-3. The government reports that "several of the defendants – by their own admission – continue to take their patients to out-of-network facilities and others remain out-of-network themselves." *Id.* at 2-3. The government further notes that the Court "imposed the no out-of-network billing condition on defendant Won" but "backed away from the condition for subsequent defendants after they claimed that it would restrict their ability to practice medicine and ruin them financially." *Id.* at 3 (footnote omitted). And, the government explains, because the Court "backed away from this condition, the government, in an effort to treat the defendants equally, did not oppose defendant Won's written request to remove this condition." *Id.* at 3 n.1.

"The government now asks the Court to impose a more modest condition of release to protect the public from the potential financial harm caused by the defendants as they await trial." *Id.* at 3. The government acknowledges that "there is nothing unlawful about billing out-of-network" but asserts that "illegal remuneration and the fraudulent waiver or reduction of coinsurance often go hand-in-hand with out-of-network billing" and that, "here, those are the unlawful practices that the defendants are specifically charged with." *Id.* And the government acknowledges that "[t]he Court is required to impose the least restrictive combination of conditions necessary to protect the public from the defendants, including any financial harm they might impose," under 18 U.S.C. § 3142(c), but asserts that "[t]he government's proposed condition is both necessary and narrowly tailored." *Id.* at 4.

-16-

As support for this request, the government asserts that
the condition is absolutely necessary to protect the public from financial
harm. Here, the Court has already restricted (with minor exceptions), the
defendants' ability to bill all federally funded health insurance programs.
In essence, the Court made the determination that, given the charges in
the indictment, the risk of fraud and abuse was too great to allow the
defendants to continue billing federal programs under any circumstances.
Yet, those programs suffered just a fraction of the loss at issue in this
case. Private insurance programs – or, more precisely, the self-funded
plans they administer – suffered the bulk of the financial harm charged
in the indictment. But, as it stands, there is nothing in the current
conditions of release to preclude the defendants from defrauding private
insurance companies through out-of-network billing other than their
unverifiable word that they will not pay or accept remuneration, and will
otherwise follow the law.

This should concern the Court. Unlike the vast majority of
providers, many of the defendants informed the Court at their initial
appearances that they do not have contracts with insurance companies
and – despite their patients' best financial interests – they continue to
take their patients to out-of-network facilities. Further, the government's
investigation has revealed that several of the defendants received
payments from out-of-network hospitals and surgery centers other than
FPMC, and many of those payments were received well after the end of
the charged conspiracy. At the very least, 18 U.S.C. § 3142 empowers this
Court to require verification that the defendants are billing
out-of-network in a lawful manner while on supervised release – at this
point, their word is simply not good enough.

It is also important for the Court to understand who the victims
are in this case. Contrary to what defense counsel would like the Court
to believe, their clients are not charged with defrauding massive
insurance companies. Instead, the victims in this case are self-funded
plans – school districts, cities, small businesses, trucking companies, and
their employees – all of whom contracted with the likes of Cigna, Aetna,
and United Healthcare to administer their programs. And those insurers
generally paid (and continue to pay) claims through an automated
system, relying on the good faith of the provider to submit a true and
accurate claim and to disclose all material facts, including any waiver or
reduction of coinsurance. To be sure, most insurance plans offer
out-of-network benefits in addition to in-network benefits. But there is a
built in deterrence to the use of out-of-network benefits in the form of
substantial coinsurance owed by the patient.

When providers conceal their waiver/reduction of out-of-network

-17-

coinsurance, they defraud self-funded plans in two different ways. First, they deprive the insurers of information material to their decision regarding whether and how much to pay in reimbursement. *See Blachly v. United States*, 380 F.2d 665, 673 (5th Cir. 1967) ("The deceitful concealment of material facts may also constitute actual fraud."). Second, they cause the submission of false and inflated charges that do not reflect the undisclosed discount provided to the patient. The end result is the unwarranted payment of reimbursement at substantial out-of-network rates, which depletes the risk pools of self-funded plans, resulting in increased insurance premiums for employees.

*Id.* at 4-6. The government further argues that

the proposed condition is the least restrictive possible. It does not preclude the defendants from billing out-of-network or taking their patients to out-of-network facilities. Nor does it even require the defendants (or the hospitals where they have privileges) to collect out-of-network patient responsibility. Instead, it does nothing more than require the defendants to provide proof that they (and the facilities where they are taking their patients) are billing out-of-network in a lawful manner. FPMC's own written "Financial Ethics and Billing" policy from its opening provided that "[w]aiver of co-payments and deductibles by an 'out-of-network' provider may be viewed as a potential kickback, insurance fraud or grounds for disciplinary action against the physician who waives the co-payments, co-insurance or deductible." The Ethics and Billing policy went on to warn that "[w]e believe that the same exposure exists for the provider who consistently discounts the patient portion of the payment as it does for writing off that portion." That same policy notes that, in Texas, the Attorney General has taken the view that waiving or reducing coinsurance "may be deemed an unfair trade practice or violate Texas illegal remuneration laws." It also warned of potential liability for mail or health care fraud under the applicable federal statutes.

    In addition, each of the named victims in the indictment – Cigna, Aetna, United Healthcare, and the Federal Employees Health Benefits program – take the position that a provider's waiver or reduction of patient responsibility payment is a material fact, and that the failure to disclose such practices when the provider submits a bill is a fraudulent omission as well as the submission of a false, fraudulent, and inflated bill.

    In short, there is no less restrictive condition than requiring the defendants to verify that they are following the law. In this regard, the proposed condition is nothing more than a targeted mechanism to ensure that the defendants are abiding by the standard condition requiring that

-18-

they not violate any local, state, or federal law.

*Id.* at 6-7.

The government therefore contends that,

[i]n sum, the federal interest in protecting teachers, sanitation workers, and truckers from being defrauded by the defendants is strong and comparable to the federal interest in protecting taxpayers who fund federal health care programs. Absent the requested condition, the insurance companies that act as third party administrators of the victims' plans and programs are virtually powerless to determine whether the defendants' out-of-network billings are legitimate or unlawful. And the requested condition does no more than require the defendants to verify through documentation that they are following the law.

*Id.* at 7.

Dr. Barker opposes the government's request, asserting that "[t]he government asks this Court to impose a new restrictive condition of release on Dr. Barker when the Court has already addressed this very issue in connection with several co-defendants and declined the government's request to impose the condition." Dkt. No. 218 at 1. Dr. Barker explains that, "[o]ver the government's objection, this Court refused to place an Out-of-Network restriction on several defendants and removed the restriction from the only doctor against whom the restriction had been initially imposed" and that "[n]othing has changed since the Court made its ruling; no new circumstance has emerged that would warrant reconsideration of the Court's prior ruling. The government does not, because it cannot, argue as much." *Id.* (footnote omitted); *see also id.* at 2-3. Instead, Dr. Barker argues, "the government seeks to take a second bite at the apple in the form of its motion to modify when nothing has changed since this Court's earlier ruling." *Id.* at 3.

Dr. Barker further contends that the government's argument "that 'the [new] condition is absolutely necessary to protect the public from financial harm,' because for some period between nine and four years ago, Forest Park Medical Center ('FPMC') – a hospital that has since gone out of business – allegedly 'waived or substantially reduced patients' out-of-network coinsurance' and concealed that fact from insurance companies" "fails for several reasons: (1) there is no evidence that Physician-Defendants themselves engaged in inappropriate waiver of out-of-network coinsurance or that they are linked to any inappropriate waiver by FPMC; (2) waiving of out-of-network coinsurance is not criminal conduct, in any event; and (3) the government has presented no evidence, and the Indictment does not charge, that Physician-Defendants are continuing to violate any law." *Id.* at 3-4.

And Dr. Barker argues that, "[i]f the Court were to consider now adding a condition relating to out-of-network billing, the government's proposed condition is far from the least restrictive," where, "[a]s drafted, the government's condition would impose requirements with which Dr. Barker cannot comply – verification and documentation of the billing practices of third-party facilities, over which Dr. Barker can exert no control – and would make administration of Dr. Barker's practice untenable, likely bringing an end to his medical career." *Id.* at 6.

The Moving Defendants and Dr. Shah also filed a response in opposition to the government's motion, asserting that "[t]here is no basis in law to support the Government's proposed conditions, which in practice will severely limit, if not completely shut down, the Defendants' respective practices" and which "far exceed the

type of conditions enumerated under 18 U.S.C. § 3142 and should be rejected because they are not the 'least restrictive further condition' to 'reasonably assure the appearance' of Defendants 'and the safety of any other person and the community,' but rather constitute punitive restrictions designed to deprive Defendants of their ability to treat patients, and remain employed, thereby limiting their ability to provide for their own defense." Dkt. No. 220 at 2-3. And, they argue, "the proposed conditions have no nexus to the allegations in the Indictment, which involve an alleged kickback and bribery scheme that ended in 2013." *Id.* at 3.

According to the Moving Defendants and Dr. Shah,

[t]his is not a typical healthcare fraud case against physicians where the Government alleges criminal activity related to quality of services or false billing. Nor is it a case in which federal insurance programs are being victimized and exploited as a result of criminal activity. Rather, the Government brings novel charges attempting to criminalize activities where the law is unsettled, in flux, and federal judges cannot agree even in the civil context.

In typical healthcare fraud cases, the Government sometimes requests that the Court eliminate physicians' ability to bill federal insurance programs as a condition of release. Even though such a condition is unnecessary in this case to ensure public safety and prevent any alleged conduct, particularly when the alleged conspiracy ended in 2013, the Government sought to impose the restriction anyway. Certain defendants have already sought to modify or clarify that condition.1 Still, the Government apparently feels that shutting down the Defendants' ability to bill federal insurance programs will not sufficiently damage the Defendants' ongoing ability to treat patients and earn a living, so it now seeks an even more punitive condition of release designed to control and limit, and ultimately preclude, the method in which Defendants provide services to patients on an out-of-network ("OON") basis. Indeed, the Government admits that the primary basis for declining to restrict OON billing originally is that it "effectively renders [Defendants] unemployable" and that precluding them from billing OON "would effectively put them out of business." (Dkt. 217, Government's Opposition to Motion to Modify, pg. 5).

-21-

*Id.* at 1-2 (footnote omitted).

These defendants explain that,

[i]n order to provide services and receive payment on an "in-network" basis, the healthcare provider – such as a physician or facility – and the payor enter into private contracts that govern the rate and terms upon which payment for services will be provided. The payor has decision-making power as to which physicians and facilities are accepted to its network. Physicians and facilities must apply for in-network status, which involves submitting an application and detailed supplemental information, as well as negotiations with the payor for the rate and terms of reimbursement. This is not an automatic or quick process. There are, however, significant benefits to performing services on an in-network basis, including faster reimbursement and increased volume of patients based on in-network referrals.

Given the length of time required to obtain in-network status, many physicians and facilities are forced to operate OON for a number of months or even years before becoming eligible to apply for in-network status or gaining acceptance into a network. Moreover, many physician-owned surgery centers and hospitals operate OON because they do not have the negotiating power of the large healthcare networks, such as Baylor or Texas Health Resources. The insurance companies refuse to provide comparable reimbursement rates to smaller in-network providers, forcing providers to remain OON or accept reimbursement rates below their costs. Contrary to the Government's view, there is nothing inherently nefarious about operating OON – the insurance companies provide OON services to patients who pay a premium for the right to choose any physician, and health care providers operate OON when they do not have an in-network contract.

Notably, several of the Defendants, including Dr. Won, Dr. Henry and Dr. Shah, who previously enjoyed in-network status with payor insurance companies, have received notification that their in-network privileges have been revoked solely as a result of the Indictment. *See, e.g.* Exhibit A (Letter from Aetna to Dr. Won notifying him that his Medicare Advantage and commercial network privileges have been revoked as of December 1, 2016); Exhibit B (same letter from Aetna to Dr. Shah). The privilege to operate in-network has been taken away from the Defendants by certain insurance companies, yet the Government is now trying to punish Defendants more by imposing overly restrictive conditions on OON services that render their provision impossible, as discussed below.

*Id.* at 4-5.

The Moving Defendants and Dr. Shah argue that the government's proposed conditions "are not designed to alleviate any risk to the public," where "there is no nexus to the allegations in the Indictment because the Government has conceded that OON billing is not illegal" and "the allegations in the Indictment concerning waiver or reduction of OON patient charges relate to FPMC's billing practices –not the individual Defendants' individual billing practices." *Id.* at 6-7. "Specifically, the Indictment contains no allegation that Defendants themselves routinely and systematically waived co-pays, or that they are currently engaged in 'fraudulent waiver or reduction of co-insurance,'" and "the Indictment does not allege any ongoing fraudulent activity." *Id.* at 7 (footnotes omitted). "Indeed, the alleged conspiratorial acts ceased in 2013. The Indictment does not allege that Defendants, or their respective physician practice groups, continue to engage in any purportedly unlawful behavior related to OON billing or otherwise." *Id.* at 7 n.5.

These defendants further contend that, because "each Defendant has been ordered as a condition of release to continue or actively seek employment," the government's requested conditions are "inconsistent with the current condition that they remain employed in that the practical effect on their practices will be detrimental." *Id.* at 7.

And the Moving Defendants and Dr. Shah oppose the government request because "the proposed conditions create restrictions that (1) are impossible to comply with, (2) will significantly limit patients' ability to receive OON treatment to which they are entitled, and (3) will significantly limit Defendants' ability to provide

necessary medical services." *Id.* at 3.

These defendants argue that requiring them "to follow the OON Conditions, which they are not contractually or legally required to do, imposes an overly burdensome and restrictive condition on their ability to treat patients" and that, while "[t]he Government asks this Court to impose restrictions that no other physician is subject to because 'their word is simply not good enough,'" in light of "the disconnect between the OON Conditions and the alleged misconduct, requiring the OON Conditions in connection with Defendants' current business activities is punitive in nature, and designed to preclude Defendants' ability to practice medicine." *Id.* at 7 (quoting Dkt. No. 171 at 3).

According to the Moving Defendants and Dr. Shah,

> [t]o burden Defendants with the impossible, unworkable, and punitive OON Conditions would violate Section 3142's mandate that whatever conditions of release are imposed on a defendant be the least restrictive conditions to reasonably assure the safety of the community. Defendants have agreed to "not accept or facilitate payment from any hospital, or surgical center, or any business affiliated directly or indirectly with a hospital or surgical center to any individual or entity with the intent to direct patients or referrals to a hospital or surgical center." Any further restriction is unnecessarily restrictive and punitive. For these reasons, Defendants request that the Court

*Id.* at 10.

## Legal Standards

Where the government does not seek pretrial detention under 18 U.S.C. § 3142, detention may only be considered on the Court's own motion "in a case, that involves – (A) a serious risk that such person will flee; or (B) a serious risk that such person will

obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2).

Where neither the government nor the Court seek pretrial detention, the Court is required to "order the pretrial release of the person on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a), unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b).

If release under Section 3142(b) on personal recognizance or an unsecured appearance bond will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, the Court is directed to release a defendant "subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person – ... (ii) maintain employment, or, if unemployed, actively seek employment; ... (iv) abide by specified restrictions on personal associations, place of abode, or travel; (v) avoid all contact with

an alleged victim of the crime and with a potential witness who may testify concerning the offense; ... and (xiv) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B); *accord United States v. Byrd*, 969 F.2d 106, 108 (5th Cir. 1992).

"The judicial officer [who set a defendant's conditions of pretrial release] may at any time amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). And, "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court – (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for ... amendment of the conditions of release; and (2) the person may file, with the court having original jurisdiction over the offense, a motion for amendment of the conditions of release. The motion shall be determined promptly." 18 U.S.C. § 3145(a).

## Analysis

Proper conditions of pretrial release under Section 3142(c) are not intended to punish defendants, who have not yet been convicted of or sentenced for the charged offenses at issue. Neither are they intended to serve as a discovery device for the government to gather evidence on the charged offense or separate or future criminal activity.

In setting conditions under Section 3142(c)(1), the Court's task, rather, is to ascertain and "impose the least restrictive combination of conditions that the court

determines will reasonably assure [a defendant's] appearance as required and the safety of any other person and the community." *United States v. Yeh*, No. 3:08-cr-96-P, 2013 WL 6568118, at *2 (N.D. Tex. Dec. 13, 2013). And the Court is directed to impose conditions that will reasonably assure – not guarantee – the appearance of the person as required and the safety of any other person and the community. *See United States v. Fortna*, 769 F.3d 243, 250 (5th Cir. 1985).

The Court is persuaded that an appropriate nexus is lacking between the allegations in the Indictment against the Moving Defendants and the condition that the Court previously imposed on each precluding "billing federal insurance programs, including Medicare, Medicaid, Department of Labor, Tricare, and Federal Healthcare Benefits Program."

As the Moving Defendants explain, this is not a case in which these individual defendants are alleged to have made or directed fraudulent billings to a federal program. And the Moving Defendants (along with Dr. Shah) are each subject to – and do not challenge – a special condition specifically tied to the offense conduct alleged against each of them: "Do not accept or facilitate payment from any hospital, or surgical center, or any business affiliated directly or indirectly with a hospital or surgical center to any individual or entity with the intent to direct patients or referrals to a hospital or surgical center." *See* Dkt. No. 169 at 4; Dkt. No. 220 at 4, 10.

The Court now determines that this unchallenged special condition – to which, notwithstanding the Moving Defendants' request, the Court does not believe the modifier "unlawfully" need or should be added – and the others to which each of the

Moving Defendants is now subject are the least restrictive combination of conditions that will reasonably assure each defendant's appearance as required and the safety of any other person and the community while the defendant is on release pending trial in this case.

For the same reason and as the defendants' responses persuasively explain, and as the Court already concluded during the initial appearances of all of the Moving Defendants other than Dr. Won, the government's requested conditions as to out-of-network billing lack a sufficient nexus to the alleged offense conduct or any risk of any alleged ongoing or future illegal activity to justify imposing any such restrictions or requirements on these individual defendants. The Court would also be concerned with whether it would be proper to order or enjoin each defendant to turn over the requested material to the Federal Bureau of Investigation, as opposed to or in addition to pretrial services officers. But the Court determines that no special conditions targeting out-of-network billing are warranted here under Section 3142(c)(1)(B).

The government relies heavily on another court's observation that "[i]t is not uncommon for courts to impose conditions of pretrial release that attempt to prevent or reduce the risk that the defendant will engage in similar or related criminal activities to those charged in the complaint or indictment." *United States v. Call*, 874 F. Supp. 2d 969, 979 (D. Nev. 2012). That decision further observed: "Defendants charged with crimes involving the use of computers or the internet may, for example, be denied or restricted in their future access to computers, including the use of computers at work. Similarly, a defendant may be precluded from engaging in a certain

occupation or employment if there is a substantial risk that the defendant will use the access provided by the employment to commit additional crimes." *Id.* This Court has imposed special conditions precluding certain defendants indicted for preparing fraudulent tax returns from preparing tax returns for others while on release and precluding certain defendants charged with submitting fraudulent billing to federal health care programs from billing to those programs while on release.

Even measured against that standard, the circumstances presented here and the government's charges in the Indictment do not show a substantial risk that the Moving Defendants, Dr. Barker, or Dr. Shaw will engage in illegal activity in connection with out-of-network billing or fraudulent or false billing to federal programs while on release. And, as noted above, each of these defendants is subject to a special condition targeting kickbacks and bribery as alleged in the Indictment as well as the mandatory condition that he "must not violate federal, state, or local law while on release." Dkt. No. 32 at 1, 3 (Dr. Won); Dkt. No. 38 at 1, 3 (Dr. Rimlawi); Dkt. No. 43 at 1, 3 (Dr. Kim); Dkt. No. 48 at 1, 3 (Dr. Nicholson); Dkt. No. 53 at 1, 3 (Dr. Henry); Dkt. No. 57 at 1, 3 (Dr. Shah); Dkt. No. 94 (Dr. Won).

The government refers to the special conditions that it has requested for the physician defendants as "standard" or "quasi-standard in healthcare conspiracy cases." Dkt. No. 217 at 1. But, under Section 3142(c)(1), the only standard conditions are the statutorily mandated conditions of pretrial release, which include "not commit a Federal, State, or local crime during the period of release." 18 U.S.C. § 3142(c)(1)(A). The government notes that "the defendants are already under indictment for violating

the law, specifically with respect to federally-funded health care programs," and refers to this mandatory do-not-violate-the-law condition as "merely a requirement of citizenship" that "does nothing to reduce the risk that the defendant[s] will engage in similar or related criminal activities to those charged in the complaint or indictment." Dkt. No. 217 at 5, 6 (internal quotation marks omitted). But, under the Bail Reform Act, this mandatory condition is considered effective for those defendants released "on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court" as well as for defendants as to whom "the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community" and that it must impose "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person." 18 U.S.C. §§ 3142(b), 3142(c)(1).

At the same time, the government asserts that the proposed out-of-network conditions are "nothing more than a targeted mechanism to ensure that the defendants are abiding by the standard condition requiring that they not violate any local, state, or federal law." Dkt. No. 171 at 7. And, the government asserts, where its "investigation has revealed that several of the defendants received payments from out-of-network hospitals and surgery centers other than FPMC, and many of those payments were received well after the end of the charged conspiracy," "[a]t the very least, 18 U.S.C. § 3142 empowers this Court to require verification that the defendants

are billing out-of-network in a lawful manner while on supervised release – at this point, their word is simply not good enough." *Id.* at 4-5.

But Section 3142 conditions of pretrial release are not an investigative tool for the government to ferret out other, suspected criminal activity. And, here, the government does not even assert that there is probable cause to believe that these defendants have engaged in criminal activity in connection with these additional out-of-network payments. If it can do so, the government has mechanisms available to it to investigate criminal activity.

But these defendants have not, by being indicted for other alleged past criminal conduct and being released under Section 3142(c), forfeited their rights to the protections afforded them under the United States Constitution and the Federal Rules and governing statutes as to the required showings the government must make and the procedures with which it must comply to obtain access to information for its investigations. Put simply, the defendants' being indicted and subject to pretrial release – not post-conviction supervised – does not subject them to a requirement to prove to the government that they are not committing other offenses, any more than they would be subject to such a condition had the government successfully moved to detain them pending trial.

Further, the mandatory do-not-violate-the-law condition is hardly toothless. If any defendant violates the condition that he not commit a crime while on release, he faces – in addition to any exposure for criminal liability as to new offense conduct – possible, significant consequences, including revocation of pretrial release under 18

U.S.C. § 3148 and enhanced penalties under 18 U.S.C. § 3147.

The Court finds the government's arguments in favor of its requested conditions in connection with billing federal programs or insurance on an out-of-network basis to be too attenuated as to the offense conduct – all dated some years ago – charged against these individual defendants. Some of the parties' arguments noted above turn on the alleged harm (or alleged lack thereof) that these requested conditions would cause or are causing these defendants and others. The Bail Reform Act, of course, does not dictate that additional preclusive or restrictive conditions are presumptively appropriate if they would not cause a defendant harm or injury. But, to be clear, the Court is reconsidering and reversing course on its prior determination that the no-billing-federal-programs condition is necessary or appropriate as to these defendants based on the alleged offense conduct. The Court now determines that, regardless of whether or not the previously imposed no-billing-federal-programs condition or the government's requested out-of-network conditions would significantly harm the defendants, these conditions are not part of the least restrictive combination of conditions that will reasonably assure these defendants' appearances as required and the safety of any other person and the community while they are on release pending trial.

The government also takes issue with the Moving Defendants' request to modify the no-contact special condition, primarily because the Moving Defendants provide only Dr. Rimlawi and Dr. Shah's practicing at the same institute as an example. But the example is well-taken as support for the specific exception that the Moving Defendants

seek. The concern, as the government notes, is with codefendants' communicating about this prosecution or investigation outside the presence of counsel.

To best address that concern, as part of what the Court determines to be the least restrictive combination of conditions that will reasonably assure each defendant's appearance as required and the safety of any other person and the community, the Court will add the following condition as to each of the Moving Defendants and Dr. Shah: "Defendant may communicate with any physicians, employees, or contractors, including co-defendants, with whom he works regarding matters unrelated to the subject indictment."

## Conclusion

For the reasons and to the extent explained above, the Court GRANTS the Motion to Clarify and Modify Conditions of Release [Dkt. No. 169] and DENIES the Government's Motion to Modify Conditions of Supervised Release [Dkt. No. 171]. The Court MODIFIES the Orders Setting Conditions of Release for Defendants Douglas S. Won [Dkt. Nos. 32 & 94], Michael Bassem Rimlawi [Dkt. No. 38], David Daesung Kim [Dkt. Nos. 43 & 166], William Daniel Nicholson, IV [Dkt. No. 48], and Shawn Mark Henry [Dkt. No. 53] to remove the following condition: "No billing federal insurance programs, including Medicare, Medicaid, Department of Labor, Tricare, and Federal Healthcare Benefits Program." The Court further MODIFIES the Orders Setting Conditions of Release for Defendants Douglas S. Won [Dkt. Nos. 32 & 94], Michael Bassem Rimlawi [Dkt. No. 38], David Daesung Kim [Dkt. Nos. 43 & 166], William Daniel Nicholson, IV [Dkt. No. 48], Shawn Mark Henry [Dkt. No. 53], and

Mrugeshkumar Kumar Shah [Dkt. 57] to add the following condition: "Defendant may communicate with any physicians, employees, or contractors, including co-defendants, with whom he works regarding matters unrelated to the subject indictment."

SO ORDERED.

DATED: January 24, 2017

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE